IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RICHARD THEIS, derivatively on behalf of 2U, INC.<br><br>                    Plaintiff,<br><br>        v.<br><br>CHRISTOPHER J. PAUCEK, CATHERINE A. GRAHAM, PAUL A. MAEDER, ROBERT M. STAVIS, GREGORY K. PETERS, TIMOTHY M. HALEY, VALERIE B. JARRETT, EARL LEWIS, CORETHA M. RUSHING, SALLIE L. KRAWCHECK, JOHN M. LARSON, EDWARD S. MACIAS, and ALEXIS MAYBANK,<br><br>                    Defendants,<br><br>        and<br><br>2U, INC.,<br><br>                    Nominal Defendant. | Case No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Richard Theis ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of nominal defendant 2U, Inc. ("2U" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) as officers and/or directors of 2U for breaches of fiduciary duty, insider sales and misappropriation of information, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his allegations on personal knowledge as to his own acts, and on information and belief as to all other allegations, based upon investigation by counsel, including, but not limited to, a review and analysis of: (i) regulatory filings made by 2U with the U.S. Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by 2U; (iii) two purported securities class action lawsuits filed in the United Stated District Court for the Southern District of New York, captioned *Harper v. 2U, Inc., et al.*, Case No. 8:19-cv-

03455 (S.D.N.Y.) and *Chinn v. 2U, Inc., et al.*, Case No. 1:19-cv-07479 (S.D.N.Y.) (together, the "Securities Class Actions"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning 2U.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of 2U's officers and members of the Company's Board of Directors (the "Board") and their affiliates.  Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws from February 26, 2018 through July 30, 2019 (the "Relevant Period") that have caused and continue to cause substantial monetary damages to 2U and other damages, including damages to its reputation and goodwill.

2.      2U is a software-as-a-service and educational technology company headquartered in Lanham, Maryland that partners with nonprofit colleges and universities to offer online degree programs through a cloud-based platform.

3.      During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that:  (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory; (ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the

Individual Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

4.     On July 30, 2019, 2U released its second quarter 2019 financial results.  On a conference call held with investors and analysts, defendant Christopher J. Paucek ("Paucek") explained that 2U was "moderating [its] outlook for the business in the short term" and, "[e]xcluding the expected financial impact of Trilogy, this implies a step down in revenue expectations for the rest of the business."  In addition, 2U stated that it expected to suffer losses of between $157.5 million and $151.5 million for the year, a 300% year-over-year increase. Defendant Paucek also disclosed that the Company needed to significantly curtail expansion plans that had been announced only a few months earlier, in November 2018, stating that the growth story had been a "mistake" and he now needed to "level set" with the investment community.

5.     On this news, the price of 2U stock collapsed, falling to a close of $12.80 per share, down 65% on extremely heavy trading volume.

6.     Finally, during the Relevant Period, the Director Defendants (defined herein) negligently issued materially false and misleading proxy statements urging stockholders to reelect the Director Defendants under false pretenses.

7.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, 2U has sustained damages as described below.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n), and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.

9.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

10.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b) as the Company conducts business in this District, and the misconduct occurred in substantial part in this District, including the dissemination of materially false and misleading statements into this District.  In addition, the defendants have conducted business in this District, and the defendants' actions have had an effect in this District.

## PARTIES

13.     Plaintiff has continuously held 2U common stock at least since May 4, 2017.

14.     2U is a Delaware corporation with its principal executive offices located at 7900 Harkins Road, Lanham, Maryland 20706.  2U's Common stock shares trade on the Nasdaq Global Select market ("NasdaqGS") under the ticker symbol "TWOU."

15.     Defendant Paucek has served as a director of the Company and Chief Executive Officer ("CEO") since October 2014.  Defendant Paucek is named as a defendant in the Securities Class Actions.  According to the Company's filings with the SEC, defendant Paucek received $16,923,643 in compensation in 2018.  Defendant Paucek sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| September 10, 2018 | 75,000 | $84.42 | $6,331,710 |
| April 16, 2018 | 193,544 | $82.72 | $16,010,408 |

16.     Defendant Catherine A. Graham ("Graham") has served as Chief Financial Officer of the Company since April 2012.  According to the Company's filings with the SEC, defendant Graham received $3,490,150 in compensation in 2018.  Defendant Graham is named as a defendant in the Securities Class Actions.

17.     Defendant Paul A. Maeder ("Maeder") has served as a director of the Company since 2010 and as Chairman of the Board since November 2012.  According to the Company's filings with the SEC, defendant Maeder received $154,964 in compensation in 2018.

18.     Defendant Robert M. Stavis ("Stavis") has served as a director of the Company since 2011.  According to the Company's filings with the SEC, defendant Stavis received $154,964 in compensation in 2018.  During the Relevant Period, defendant Stavis served as Chairman of the Company's Audit Committee.

19.     Defendant Gregory K. Peters ("Peters") has served as a director of the Company since March 2018.  According to the Company's filings with the SEC, defendant Peters received $189,914 in compensation in 2018.  During the Relevant Period, defendant Peters served as a member of the Audit Committee.

20.     Defendant Timothy M. Haley ("Haley") has served as a director of the Company since 2010.  According to the Company's filings with the SEC, defendant Haley received $144,960 y in compensation in 2018.  Defendant Haley sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| March 7, 2018 | 45,000 | $88.67 | $3,990,000 |

21.     Defendant Valerie B. Jarrett ("Jarrett") has served as a director of the Company since December 2017.   According to the Company's filings with the SEC, defendant Jarrett received $218,616 in compensation in 2018.

22.     Defendant Earl Lewis ("Lewis") has served as a director of the Company since April 2014.   According to the Company's filings with the SEC, defendant Lewis received $139,960 in compensation in 2018.   During the Relevant Period, defendant Lewis served as a member of the Audit Committee.   Defendant Lewis sold the following shares with insider information regarding the Company's market manipulation, false and misleading statements, and lack of controls, all of which resulted in the Company's stock trading at artificially inflated prices at the time of his stock sales:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| June 14, 2018 | 10,393 | $95.74 | $995,026 |

23.     Defendant Coretha M. Rushing ("Rushing") has served as a director of the Company since 2016.   According to the Company's filings with the SEC, defendant Rushing received $134,997 in compensation in 2018.

24.     Defendant Sallie L. Krawcheck ("Krawcheck") has served as a director of the Company since April 2014.   According to the Company's filings with the SEC, defendant Krawcheck received $134,997 in compensation in 2018.

25.     Defendant John M. Larson ("Larson") has served as a director of the Company since June 2009.   According to the Company's filings with the SEC, defendant Larson received $144,960 in compensation in 2018.

26.     Defendant Edward S. Macias ("Macias") has served as a director of the Company since November 2014.   According to the Company's filings with the SEC, defendant Macias received $134,997 in compensation in 2018.

27.     Defendant Alexis Maybank ("Maybank") has served as a director of the Company since December 2018.  During the Relevant Period, defendant Maybank served as a member of the Audit Committee.

28.     Defendants Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank are sometimes referred to herein as the "Director Defendants."

29.     Defendants Stavis, Lewis, Maybank, and Peters are sometimes referred to herein as the "Audit Committee Defendants."

30.     Defendants Paucek, Lewis, and Haley are sometimes referred to herein as the "Insider Selling Defendants."

31.     Defendants Paucek, Graham, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank are sometimes referred to herein as the "Individual Defendants."

## **DUTIES OF THE INDIVIDUAL DEFENDANTS**

32.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

35.     To discharge their duties, the officers and directors of 2U were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of 2U were required to, among other things:

    a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

    b.    conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    c.    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

36.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.     According to the Company's Corporate Governance Guidelines, the Board members, and therefore the Director Defendants, are required to:

oversee the performance of the chief executive officer ("CEO") and other senior management and to assure that the best interests of stockholders are being served. To satisfy this responsibility, the directors are expected to take a proactive approach to their duties and function as active monitors of corporate management. Accordingly, the directors provide oversight in the formulation of the long term strategic, financial and organizational goals of the Company and of the plans designed to achieve those goals.  In addition, the Board reviews and approves standards and policies to ensure that the Company is committed to achieving its objectives through the maintenance of the highest standards of responsible conduct and ethics and to assure that management carries out their day-to-day operational duties in a competent and ethical manner.

38.     The Company also maintains a Code of Business Conduct and Ethics (the "Code"). The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of 2U and its subsidiaries.

39.     According to the Code, the employees and directors of 2U are responsible for helping 2U maintain its good reputation and the trust and confidence of its stockholders, its employees, the public, and those with whom 2U does business.

40.     Pursuant to the Code:

**1. HONEST AND ETHICAL CONDUCT**

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

**2. LEGAL COMPLIANCE**

Obeying the law is the foundation of the Code of Conduct. Our success depends upon our personnel operating within legal guidelines and cooperating with local, national and international authorities. We expect our personnel to understand the legal and regulatory requirements applicable to their business units and areas of responsibility.

*       *       *

**8. MAINTENANCE OF CORPORATE BOOKS, RECORDS, DOCUMENTS AND ACCOUNTS; FINANCIAL INTEGRITY; PUBLIC REPORTING**

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries in our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or otherwise, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to our university partners, vendors, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- personnel comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees and independent contractors who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee or independent contractor may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees and independent contractors must cooperate fully with our accounting and audit teams, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee or independent contractor should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee or independent contractor who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 10 or in accordance with the provisions of the Company's Open Door Policy for Reporting Complaints Regarding Accounting and Auditing Matters.

41.    In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities.   The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

42.    Pursuant to the Charter:

The primary purpose of the Audit Committee (the "Committee") shall be to act on behalf of the Board of Directors (the "Board") of 2U, INC., a Delaware corporation (the "Company"), in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, (ii) the Company's systems of internal control over financial reporting and audits of financial statements, (iii) the quality and integrity of the Company's financial statements and reports, (iv) the qualifications, independence and performance of the registered public accounting firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), (v) the performance of the Company's internal audit function, and (vi) the Company's legal, regulatory and ethical compliance programs as established by management and the Board.

*       *       *

**RESPONSIBILITIES**

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

*       *       *

*Responsibilities with respect to Financial Statements and Related Disclosures*

**11. *Audited Financial Statement Review***. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend to the Board whether such financial statements should be so included.

**12. *Annual Audit Results***. To review with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and practices, any critical audit matters arising from the current period audit, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

**13. *Quarterly Results***. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

**14. *Management's Discussion and Analysis***. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**15. *Disclosure Committee***. To meet with the Disclosure Committee (or a representative thereof), as part of the Committee's regular review of the Company's Form 10-K and Form 10-Q reports (and other filings by the Company with the SEC), when applicable and as deemed necessary, appropriate or desirable by the Committee or management.

**16. *Press Releases***. To review and discuss with management and the Auditors, as appropriate, earnings press releases, and press releases containing information relating to material developments as well as the substance of financial information, information relating to material developments and earnings guidance provided to analysts and rating agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of these discussions.

**17. *Accounting Principles and Policies***. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet arrangements and, as the Committee deems appropriate, any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies.

**18. *Management Cooperation with Audit***. To evaluate the cooperation received by the Auditors during their audit, including a review with the Auditors of any significant difficulties encountered during the audit or any restrictions on the scope of their activities or access to required records, data and information, significant disagreements with management whether or not resolved, and management's response, if any.

**19. *Risk Assessment and Management***. To review and discuss with management, the Auditors and the Board, as appropriate, the Company's guidelines and policies with respect to risk assessment and risk management, including risks relating to the Company's accounting matters, financial reporting, data privacy, cybersecurity, and legal and regulatory compliance and the steps taken by management to monitor and control these exposures; and to review and discuss with management, as appropriate, insurance programs, including director and officer insurance, product liability insurance and general liability insurance.

**20. *Management Letters***. To review and discuss with the Auditors and, if appropriate, management, any management or internal control letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

**21. *Disagreements Between Auditors and Management***. To review and discuss with management and the Auditors, or any other registered public accounting firm engaged to perform review or attest services, any conflicts or disagreements between management and the Auditors, or such other accounting firm, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and to resolve any conflicts or disagreements regarding financial reporting.

*Responsibilities with respect to Internal Audit and Internal Control*

**22. *Internal Control Over Financial Reporting***. To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of the Company's internal control over financial reporting including (a) significant

deficiencies or material weaknesses identified by the Company's Auditors, as well as any special steps adopted in light of significant deficiencies or material weaknesses, if any, and the adequacy of disclosures about changes in internal control over financial reporting, and (b) any fraud, whether or not material, that involves management or other employees who have any significant role in the Company's internal control over financial reporting.

**23. *Internal Audit Function*.** To coordinate the Board's oversight of the performance of the internal audit function. In this regard, the Committee shall: (a) approve decisions regarding the appointment and removal of the senior internal auditing manager, (b)l review any reports to management or the Board from the internal audit department, including the annual internal audit plan, and management's response to such reports, (c) review the charter for the internal audit function annually and approve any changes and (d) determine the appropriateness of the internal audit function's scope and resources.

43.    In violation of the Charter and their general duties as members of the Audit Committee, the Audit Committee Defendants conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting. The Audit Committee Defendants' complete failure to perform their duties in good faith resulted in false representations to the SEC, the investing public, and the Company's stockholders.

44.    In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NasdaqGS, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary

duties by knowingly or recklessly causing 2U to make false and misleading statements of material fact about the Company's financials and about 2U's maintenance of adequate internal controls.

45.     Each of the Individual Defendants further owed to 2U and its stockholders the duty of loyalty requiring that each favor 2U's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain a personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

46.     2U is an educational technology company that partners with nonprofit colleges and universities to offer online degree programs through a cloud-based "software-as-a-service" platform coupled with a suite of technology-enabled services, including coursework design, infrastructural support, and capital to deliver instruction to students.

47.     The Company generates revenue from two different types of segments: a Graduate Program segment, which targets students seeking a full graduate degree; and a Short Course, which targets working professionals seeking advancement through skills attainment.

48.     The Graduate Program segment derives revenue primarily from a contractually specified percentage of the amounts 2U's university clients receive from their students in the 2U-enabled graduate program for tuition and fees, less credit card fees and other specified charges that 2U has agreed to exclude in its contracts.  The Company launched the Graduate Program in 2009, shortly after its incorporation in 2008.

49.     The Short Course segment derives revenue directly from students for the tuition and fees paid to enroll in and progress through 2U's short courses.  The Company launched its Short Course segment in July 2017 with the acquisition of GetSmarter.  The Company has rebranded the "Short Course" segment as the "Alternative Credential" segment.

### The Individual Defendants Caused the Company to Issue Materially False and Misleading Statements

50.     During the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that:  (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory; (ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the Individual Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

51.     On February 26, 2018, the Individual Defendants caused the Company to release a press release announcing the Company's financial and operational results and financial projections and guidance for 2018.  The press release stated, in relevant part:

> "A decade into our journey, 2U is now at the forefront of the digital transformation in higher education and the strength of our business performance and the high-quality student outcomes in our partner programs prove it," CEO and Co-Founder Christopher "Chip" Paucek said.  "The positive momentum in our GetSmarter short course business combined with the organic growth in our graduate program business produced strong fourth quarter and full-year 2017 financial results and sets us up nicely for 2018."

*       *       *

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for first quarter and full-year of 2018.  This guidance assumes foreign exchange

17

rates as of December 31, 2017, including a U.S. Dollar/South African Rand rate of 12.39.

| | 1Q 2018 | FY 2018 |
|---|---|---|
| | (in millions, except per share amounts) | |
| Revenue | $91.1 - $91.6 | $397.7 - $402.7 |
| Net loss | $(14.9) - $(14.5) | $(45.0) - $(42.8) |
| Net loss per share | $(0.28) - ($0.27) | $(0.84) - $(0.80) |
| Adjusted net loss | $(7.3) - $(6.9) | $(7.7) - $(5.6) |
| Adjusted net loss per share | $(0.14) - $(0.13) | $(0.14) - $(0.10) |
| Weighted-average shares of common stock outstanding, basic | 52.8 | 53.5 |
| Adjusted EBITDA (loss) | $(2.3) - $(1.9) | $15.0 - $17.3 |
| Stock-based compensation expense | $6.2 - $6.3 | $31.6 - $32.1 |

52.     On the same day, the Individual Defendants hosted a conference call with investors and analysts.  During the conference call, defendant Paucek stated that 2U was operating "in a very large market that is undergoing transformation, and 2U is the company leading that transformation."  He further stated that the "power of our purpose-driven business model is evident in those results," and that the Company's success was in large part due to its having "built a ton of impressive technology across the business, and that includes the online campus we built back in 2009."  Defendant Paucek further explained that 2U was insulated from competition in part because "we believe that we're the only company right now that is – that goes very deep on both depth and breath."  He also stated that 2U was in "heavy growth mode" and was successfully investing in the long-term health of the business.

53.     On May 3, 2018, the Individual Defendants caused the Company to issue a press release announcing its first quarter of 2018 financial and operational results and an adjusted guidance for 2018.  The press release stated, in relevant part:

> "Our short course business has emerged as a powerful contributor to our growth story. When combined with the expected growth of our Graduate Program Segment, revenue guidance is up about $8 million over our prior guidance," said CEO and Co-Founder Christopher "Chip" Paucek. "In addition, the annual number of launched graduate programs has increased substantially over the past few years

18

and shows no signs of slowing down. Our pipeline also continues to be strong, giving us confidence in our revenue expectations in that core segment in future years."

* * *

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for second quarter and full-year of 2018. This guidance assumes foreign exchange rates as of March 31, 2018, including a U.S. dollar/South African rand rate of 11.83.

|  | 2Q 2018 | FY 2018 |
|---|---|---|
|  | (in millions, except per share amounts) | |
| Revenue | $95.1 - $96.1 | $406.6 - $410.6 |
| Net loss | $(22.1) - $(21.6) | $(46.6) - $(44.7) |
| Net loss per share, basic and diluted | $(0.42) - $(0.41) | $(0.87) - $(0.84) |
| Adjusted net loss | $(11.6) - $(11.1) | $(7.2) - $(5.3) |
| Adjusted net loss per share | $(0.22) - $(0.21) | $(0.13) - $(0.10) |
| Weighted-average shares of common stock outstanding, basic | 53.4 | 53.5 |
|  |  |  |
| Adjusted EBITDA (loss) | $(6.2) - $(5.7) | $16.1 - $18.0 |
| Stock-based compensation expense | $9.3 - $9.5 | $34.0 - $34.5 |

54.     On the same day, the Individual Defendants hosted a conference call with investors and analysts.  During the conference call, defendant Paucek stated that 2U's "short course business is thriving," that 2U was "opening up new market channels for short courses," and that 2U had "enough confidence in the short course business to raise full year revenue guidance significantly by over $8 million."  Defendant Paucek also reaffirmed 2U's commitment to its Graduate Program approach and explained that 2U provided technology that was plainly superior to any of its competitors:

We're pacing well ahead of last year on announcements and that's on a higher target.  But even more are coming, and it's pretty fast and furious.  I'm very pleased.

***Other companies in this space might like to argue they can compete, but our business model is robust for our partners and in turn for 2U.***  No other companies in the space invest like 2U.  No one builds the scale like 2U.  No one has a comprehensive approach to quality like 2U.  We do a ton of work for our schools

that others in the space simply don't and often can't do. And you don't need to take my word for it. Our clients are saying it.

At Investor Day, Kent Syverud, the Chancellor of Syracuse University, stated his strong belief that Syracuse received significant value from the investments we make with the portion of the rev share the 2U takes, providing world-class technology support and care in areas that the university shouldn't really be focused on.  And in doing so, we drive incredible student outcomes.  But financial sustainability is also critical.  ***Our long-term relationships, which are really like partnerships expressed through a revenue share, are producing a powerful business model for our partners that they simply can't find elsewhere***.[1]

*55.*     The Individual Defendants highlighted the Company's supposed growth story and explained away lower short-term margins by investments that they were making to increase the Company's revenues.  Defendant Graham described 2U as the educational version of "Amazon" and stated that 2U was "reinvesting to take advantage of momentum."  Similarly, when defendant Paucek was asked by an analyst whether 2U was gaining significant efficiencies as a result of growing its scale, he agreed, stating: "I would argue that sort of overall ecosystem that we operate now is at scale.  ***And we're seeing real benefit from that.***"

56.     On August 2, 2018, the Individual Defendants caused the Company to issue a press release announcing the Company's second quarter of 2018 financial and operational results and an adjusted guidance for 2018. The press release stated, in relevant part:

"In the three months since our last earnings report, we've announced a total of eight new graduate programs, putting us on pace to complete our 2019 launch cohort this quarter, the earliest in 2U's history" said CEO and Co-Founder Christopher "Chip" Paucek.  "Ten years in, we have a proven and unparalleled track record of delivering for our partners and their students, which continues to drive exceptional momentum in both degree and short course pipeline as well as long-term contract extensions by existing clients."

*             *             *

**Financial Outlook**

[1] Unless otherwise noted, all emphases are added.

20

Based on information available as of today, 2U is issuing the following guidance for third quarter and full-year of 2018.  This guidance assumes foreign exchange rates as of June 30, 2018, including a U.S. dollar/South African rand rate of 13.72.

|  | 3Q 2018 | FY 2018 |
| --- | --- | --- |
|  | (in millions, except per share amounts) | |
| Revenue | $106.0 - $107.0 | $409.7 - $412.2 |
| Net loss | $(11.6) - $(11.0) | $(42.7) - $(41.5) |
| Net loss per share, basic and diluted | $(0.20) - $(0.19) | $(0.77) - $(0.75) |
| Adjusted net loss | $(1.7) - $(1.1) | $(5.8) - $(4.6) |
| Adjusted net loss per share | $(0.03) - $(0.02) | $(0.10) - $(0.08) |
| Weighted-average shares of common stock outstanding, basic | 57.5 | 55.7 |
| Adjusted EBITDA | $4.2 - $4.8 | $16.9 - $18.1 |
| Stock-based compensation expense | $8.7 - $8.8 | $33.9 - $34.2 |

57.    On the same day, the Individual Defendants hosted a conference call with investors and analysts.  During the call, defendant Paucek once again reaffirmed 2U's commitment to its high-growth business model, explaining that 2U was "confident in the reacceleration over the next few years: enrollments and pipeline," and that 2U's investors need not worry about competition in the marketplace because of 2U's superior technology.  He also stated that 2U was "scaling it at quality" and "2U has a track record of scaling enrollments that's better than anyone in the space." Later, in response to an analyst's question, defendant Paucek responded:  "Our marketing has gotten more efficient.  We don't have a marketing efficiency problem."  Similarly, in a response to a question about whether the cost to acquire students was rising, he stated that, "as we get greater scale, we are able to be more effective there, not less."  Defendant Paucek further stated:

As far as the bears go, honestly, we're focused on the long term.  This is not a short-term play.  ***This is a big opportunity, and it's a worldwide opportunity, and we're the market leader.  And it's a growth story.  So we're focused on delivering a long-term sustainable business that drives high-quality student outcomes worldwide, and we're not slowing down.***

*        *        *

So I will tell you that we think it's early days, and we consider most of this fellow travelers, like you're talking about improving preconceived notions of online

education by having high-quality schools go online. ***Now we happen to like our model. We think our model is the right model***. We think our MPV strategy is working brilliantly. We think that's evidenced by the number of school signing. I mean, you don't have to believe me, look at the proof.

***And so what has happened as of late is we are starting to see contracts come to us either from schools that were running them themselves or from competitors. This is now becoming a thing, and certainly, we like it***. But once again, I would emphasize that, regardless of the sort of notion of the competition ultimately, when we power a program, we scale it, and we do it equality.

***So it's not just about being big, it's being good. And we do both. And to do that, you have to invest. And we invest heavily in this full system, that I just don't think anybody is close to comparable***. So net-net, we feel really good about our competitive position.

And so we just keep improving the operating system for social mobility. We keep improving 2UOS on a consistent basis, doing things like our acquisition of CritiqueIt to drive technology, our WeWork deal, which has been a phenomenal hit with the student body.

*       *       *

***Now we happen to think that this model provides long-term sustainability***. We think it provides a program that runs sufficiently on its own, not being subsidized either by the campus program or by an outside entity of some kind. ***And so we do indeed like our model***.

58.    On November 5, 2018, the Individual Defendants caused the Company to issue a press release announcing the Company's third quarter of 2018 financial and operational results and an adjusted guidance. The press release stated, in relevant part:

"Strong year-over-year growth combined with our stepped-up program launch targets for 2019, 2020 and 2021, have put 2U on the path to $1.0 billion in revenue, which we expect to hit in a little over three years," Co-Founder and CEO Christopher "Chip" Paucek said. "Higher education is fully embracing the power of online, and 2U's size, scale and track record put us in the pole position to seize new growth opportunities and further solidify our market leadership globally."

*       *       *

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for fourth quarter and full-year of 2018. This guidance assumes foreign exchange

rates as of September 30, 2018, including 14.14 for U.S. dollar/South African rand and 0.7675 for the U.S. dollar/British pound.

|  | 4Q 2018 | FY 2018 |
|---|---|---|
|  | (in millions, except per share amounts) | |
| Revenue | $114.4 - $115.3 | $411.0 - $411.9 |
| Net income (loss) | $2.4 - $3.0 | $(40.7) - $(40.1) |
| Net income (loss) per share, basic | - | $(0.73) - $(0.72) |
| Net income (loss) per share, diluted | $0.04 - $0.05 | |
| Adjusted net income (loss) | $12.3 - $12.9 | $(4.9) - $(4.3) |
| Adjusted net income (loss) per share, basic | - | $(0.09) - $(0.08) |
| Adjusted net income (loss) per share, diluted | $0.20 - $0.21 | - |
| Weighted-average shares of common stock outstanding, basic | 57.9 | 55.9 |
| Weighted-average shares of common stock outstanding, diluted | 61.9 | - |
| Adjusted EBITDA | $19.8 - $20.4 | $17.4 - $18.0 |
| Stock-based compensation expense | $8.7 - $8.9 | $32.8 - $33.0 |

59.     On the same day, the Individual Defendants hosted a conference call with investors and analysts.  During the call, the Individual Defendants suggested that 2U's growth would only accelerate, as they continued to invest in expanding 2U's university partners, developing new content, and attracting students.  Defendant Paucek stated:

Now looking ahead to 2019.  We're expecting consolidated revenue growth of 33.2% at the midpoint of our range. ***We're pleased with the resiliency of our grad portfolio and the power of our short course business, resulting in the type of expected growth that puts us in rarefied air among software companies***.  Look, it isn't common that a company keeps growing north of 30% off of a base of over $400 million in revenue.  We said in the past that we expect to keep revenue growth above 30% for the "foreseeable future".  We're now confident enough in the overall portfolio and the strength of the pipeline to put a timeline on it.  We think we can keep consolidated revenue growth above 30% for at least the next 5 years.  Based on these current growth expectations, 2U expects to hit $1 billion in revenue in a little over 3 years.  That used to be a long-range goal.  Now it's right in front of us.  We can see it.  You'll hear more about the path to $1 billion in the coming quarters.

*          *          *

Before I turn it over to Cathy, I wanted to quickly touch on competition.  Higher education is one of the largest markets you could operate in.  There are clearly more programs being launched, both by universities doing it themselves as well as with other companies.  This should not surprise you, but this does not mean we're not getting the programs we want.  Quite the opposite, in fact, we are in our standard

23

contract ranges.  We signed all of the programs for our initial 2019 target much earlier than for previous years. And due to the strength of the pipeline, we increased our annual launch targets for the next 3 years.  *Competition is and always will be relevant, but we believe increased adoption is an opportunity for us, not a challenge.  We're winning. Higher education as a whole is fully embracing online education.  They're realizing this is something they need to do and do it soon*.  Our current partners are asking us for more, and it's clear to me, we need to be in a position to say yes.

*That means investing more today to drive scale over the long term.  Powering more educational offerings at scale creates more options for students, which ultimately drives more outcomes and it will make us a much larger and stronger company in the long run*.

Our bottom line preview for 2019 shows we'll be investing more with our expected adjusted EBITDA margin for the year at 2% to 2.5%. Investor alignment in this effort is critical.  *So I say to you, if you're an investor interested in long-term growth and long-term cash generation, 2U is for you.  If you're an investor that believes in plowing cohort profitability back into growth, 2U is for you*.  If on the other hand, you're an investor looking for a CEO who will sacrifice future growth to build free cash flow in the short term, look elsewhere. *The TAM is too large, the opportunity is too big and we have to keep digging the moat*.

*     *     *

[Graham:] I'd like to point out that the 2019 margin declines we expect to incur to fund additional investments in marketing, and to a lesser extent, in technology improvements and content scaling, represent only a small portion of the year-over-year revenue growth we expect to generate in 2019.

At the midpoint to the full year revenue and adjusted EBITDA ranges we've provided, it implies that we will invest only slightly more than 6.5% of our expected 2019 year-over-year revenue increase in rightsizing our marketing spend, making a significant technology transition, matching course production to our increasing launch cadence and driving continued growth in quality in years to come.

*I'll also note that these additional expenditures have no impact on our belief that our current business plan is fully funded*.

*     *     *

Off the end of '18.  We are – I want to reiterate that nothing about what we're talking about in terms of margins or in terms of additional investment in 2019 in any way has us believe that we're not fully funded through self-sustaining on our current business model.

60.     On February 25, 2019, the Individual Defendants caused the Company to issue a press release announcing the Company's fourth quarter of 2018 and 2018 annual operational and financial results and a guidance for 2019.  The press release stated, in relevant part:

> "The strength and resilience of 2U's business is clear from our 2018 fourth quarter and full-year results, and reflects the continued expansion and increasing diversity of our degree and short course portfolios, both domestically and internationally," Co-Founder and CEO Christopher "Chip" Paucek said.  "Our commitment to investing in sustained growth not only sets 2U apart in the education technology industry, but will allow us to better meet the evolving needs of our partners and the marketplace."
>
> *       *       *
>
> **Financial Outlook**
>
> Based on information available as of today, 2U is issuing the following guidance for first quarter and full-year of 2019.  This guidance assumes foreign exchange rates as of December 31, 2018 for the U.S. dollar/South African rand and the U.S. dollar/British pound.

| | 1Q 2019 | FY 2019 |
|---|---|---|
| | (in millions, except per share amounts) | |
| Revenue | $121.5 - $122.1 | $546.6 - $550.8 |
| Net loss | $(22.0) - $(21.6) | $(80.2) - $(77.8) |
| Net loss per share | $(0.38) - $(0.37) | $(1.37) - $(1.33) |
| Adjusted net loss | $(10.8) - $(10.4) | $(21.8) - $(19.4) |
| Adjusted net loss per share | $(0.19) - $(0.18) | $(0.37) - $(0.33) |
| Weighted-average shares of common stock outstanding, basic | 58.2 | 58.7 |
| Adjusted EBITDA (loss) | $(4.6) - $(4.2) | $11.8 - $14.2 |
| Stock-based compensation expense | $10.0 - $10.2 | $53.7 - $54.1 |

61.     On the same day, the Individual Defendants hosted a conference call with investors and analysts.  During the call, defendant Paucek opened by stating in unequivocal terms that the Company had a sound business model:  "I'm telling you our business is resilient, it's diversified, and it's growing."  Defendant Paucek also reaffirmed that "the company is fully funded," and defendant Graham explained that the Company's revenue was on track to further grow, from $411.8 million in fiscal 2018 to $546.6 to $550.8 million in fiscal 2019.

62.     Defendant Paucek added:

***Our diversified grad portfolio is strong***.  You can see the power of the portfolio at work in the additional disclosures we shared at the end of the year, including our cohort margins and our list of grad programs by annual new student enrollment. Both can be found in our earnings deck.  Cathy will address cohort margins in her section. I'll cover the list of top grad programs by annual new student enrollment now.

As we did last year, we've again expanded the list by 5 spots, this time from 15 programs to 20 programs.  We believe the expanded list better demonstrates the progress of our newer programs and the strength of the overall portfolio.  While we don't give the exact enrollment numbers, that's the partners' call, I can share that the entire top 20 is above 200 new student enrollments and so are some of the programs outside of the top 20.  Notably, there's a program from every single cohort in the top 20. Mature programs continue to enroll new students.  ***Newer programs are scaling well***, and the 2018 cohort continues to be excellent. In fact, 7 programs on the list were launched in the past 2 years.  Let that land for a second. 7.  So much for the theory that all of the new ones will be small and suboptimal.

We're not only seeing strength across our cohorts, but across verticals.  There are 10 verticals represented on the list. 10.  It's also across geographies.  There are programs from every major region of the U.S.  We told you verticals matter and geography matters.  ***Our . . . expanding selection of programs continues to drive growth in the grad segment***.

\*          \*          \*

This is my 5th year as a public company CEO.  I can easily say last quarter was the most complicated we had.  ***It was a whirlwind.  But this whirlwind was not related to fundamental issues with our business model or overstated fears of competitive pressures***.

63.     Defendant Graham added that investors need not be concerned with cash flows as the Company continued its growth plans.  For example, defendant Graham pointed to "higher margin[s]" in more mature cohorts as a "significant part of our decision to expand marketing spend and take somewhat lower margins for 2019 to attract additional students and drive additional revenue."  She continued by stating that historical and observable data and industry trends had "validate[d]" the Company's recent decision to expand its growth strategy, stating in pertinent part:

*What we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you and makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions*.

\*      \*      \*

But despite that cautionary note, we remain excited and energized by the opportunity we have in front of us, not only for 2019 but beyond.  Our revenue and adjusted earnings measure expectations for the year are up, but more importantly, *we remain confident in our ability to continue delivering 30%-plus top line growth, get to $1 billion in revenue within 3 years and leverage a business model that we've proven can deliver profitability as programs mature*.

\*      \*      \*

So kind of what we have said is that you shouldn't think of this as being a continual degradation of margins on a year-over-year and continuing basis.  This is kind of getting us back onto the right glide path from where such a number of our programs should be.  And I can't tell you, at this point, whether 2020 will sort of flatten out in margin or step up a little.  But over time, I would say that our intention is to return to the kind of patterns that we had been seeing, which is you will see slow and – slow but perhaps steady increases in margin over time as we move towards steady state.  *You should keep in mind that for us, margins are, in many ways, a matter of choice as to how much investment we're making in growth, and I just want you guys to remember that, that this is very much within our control based on how quickly we decide to grow and what opportunities there are in front of us*.

64.     On April 8, 2019, the Individual Defendants announced that 2U was acquiring Trilogy, an adult focused online educational company, for $750 million in cash and stock.  When the Company announced the Trilogy acquisition, defendant Paucek represented:  "We expect the addition of Trilogy to accelerate our path to $1 billion in revenue by one year from 2022 to 2021 . . . ."

65.     The above statements in ¶¶ 51-64 were materially false and/or misleading because the Individual Defendants failed to disclose to investors that: (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory;

(ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the Individual Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

**THE TRUTH BEGINS TO EMERGE**

66.     On May 7, 2019, 2U reported disappointing first quarter of 2019 financial and operational results and substantially lowered the Company's guidance.  The Company stated that it was on track to achieve $13 million less in revenues than previously represented.  The press release stated, in pertinent part:

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for second quarter and full-year of 2019.  This guidance assumes foreign currency exchange rates as of March 31, 2019 for the U.S. dollar/South African rand and the U.S. dollar/British pound. . . .

| | 2Q 2019 | FY 2019 |
|---|---|---|
| | (in millions, except per share amounts) | |
| Revenue | $124.3 - $125.0 | $534.0 - $537.0 |
| Net loss | $(36.0) - $(35.5) | $(79.0) - $(77.2) |
| Net loss per share | $(0.61) - $(0.60) | $(1.35) - $(1.32) |
| Adjusted net loss | $(20.8) - $(20.3) | $(20.0) - $(18.2) |
| Adjusted net loss per share | $(0.36) - $(0.35) | $(0.34) - $(0.31) |
| Weighted-average shares of common stock outstanding, basic | 58.6 | 58.7 |
| Adjusted EBITDA (loss) | $(13.1) - $(12.6) | $12.5 - $14.3 |
| Stock-based compensation expense | $14.0 - $14.2 | $52.2 - $52.6 |

2U expects that of the revenue it recognizes in the second half of 2019, approximately 48% will be recognized in the third quarter.

Note that 2U's previously announced intention to increase marketing spend in the first half of 2019 is reflected in this guidance and has the effect of driving larger second quarter losses than would be expected under typical performance patterns.

28

Further note that cost seasonality in the second and fourth quarters typically reduces margins in the first half of each year and improves margins in the second half of each year, so second-half margins should not be viewed as being a run rate for the first half of the following year.

67.     On the same day, the Company further revealed more details about disappointing results on a conference call held with investors and analysts.  During the call, it was revealed that 2U was experiencing declines in expected graduate program enrollments.  Defendant Paucek stated that he should have "taken some air out of the balloon" on 2U's growth story.

68.     On this news, the price of 2U stock declined over 25% in a single trading day, on abnormally high volume of over 7 million shares traded, to close at $44.77 per share on May 8, 2019.  However, the price of 2U stock remained artificially inflated because the Individual Defendants had not disclosed the true state of 2U's business and prospects.  For example, the Individual Defendants insisted that the Company's business model had no fundamental defects. Defendant Paucek stated on the May 7, 2019 earnings call he saw no "challenges . . . attributable to weakness in [2U's] efficiency" and reassured investors that "*2U is still very much a growth story.*"

69.     In a July 30, 2019 press release, 2U revealed that the Company's growth plans were failing and needed to be abandoned as costs ballooned, and that the Company was significantly reducing its 2019 guidance.  The press release stated, in relevant part:

> "With the close of our Trilogy acquisition, 2U's business is evolving to better meet marketplace demand and the transforming needs of our university partners and lifelong learners," Co-Founder and CEO Christopher "Chip" Paucek said. "As we deliver our full portfolio of educational offerings to new and existing partners, we are also setting 2U on a defined path to profitability by tempering short-term growth projections and leveraging our scale to drive greater operational efficiencies across the business."

*       *       *

**Financial Outlook**

Based on information available as of today, 2U is issuing the following guidance for the third quarter and full-year of 2019. This guidance assumes foreign currency exchange rates as of June 30, 2019 remain constant, including the U.S. dollar/South African rand and the U.S. dollar/British pound.

| | 3Q 2019 | FY 2019 |
|---|---|---|
| | (in millions, except per share amounts) | |
| Revenue | $147.6 - $152.6 | $565.7 - $575.7 |
| Net loss | $(69.3) - $(66.3) | $(157.5) - $(151.5) |
| Net loss per share | $(1.10) - $(1.05) | $(2.57) - $(2.47) |
| Adjusted net loss | $(33.8) - $(30.8) | $(76.9) - $(70.9) |
| Adjusted net loss per share | $(0.53) - $(0.49) | $(1.25) - $(1.16) |
| Weighted-average shares of common stock outstanding, basic | 63.2 | 61.3 |
| Adjusted EBITDA (loss) | $(18.4) - $(15.4) | $(28.0) - $(22.0) |
| Stock-based compensation expense | $18.9 - $19.9 | $56.0 - $58.0 |

The revenue reflected in this guidance includes a deferred revenue fair value purchase accounting adjustment related to the Trilogy acquisition. Adding back revenue eliminated as a part of purchase accounting, our revenue guidance ranges would be $153.6 million to $158.6 million and $576.9 million to $586.9 million for the third quarter and full year, respectively.

In giving third quarter and full-year guidance, the Company's expectations for the fourth quarter are implied. Note that the cost seasonality driven by reduced marketing spend during the holiday period in the fourth quarter typically improves margins in that quarter; fourth quarter margins therefore should not be viewed as a run rate for the first quarter of the following year.

70.     These projected losses for the year, which included certain costs related to the Trilogy acquisition, represented a 300% year-over-year increase.

71.     On the same day, during a conference call with analysts and investors, it was revealed that 2U was "moderating [its] outlook for the business in the short term" and, "[e]xcluding the expected financial impact of Trilogy, this implies a step down in revenue expectations for the rest of the business," despite the Company's vaunted growth efforts.  It was further revealed that the Company's business model would need to undergo substantial adjustment to compete in an increasingly saturated online education market and that the Company's cash flow was inadequate for purposes of maintaining the Company's present strategies.  Defendant Paucek stated:

Over the past 11 years, we built the most important business in the online higher education ecosystem. When we started 2U, the market was in its infancy. The core thesis of the company was that online programs could drive a similar quality to campus programs and that the company's scale and unique platform characteristics would build a competitive moat around the business over time.

Today, the online education market is evolving. Secular forces are pushing more schools online. Indeed, it's becoming obvious that all schools are going online. We're calling it the mainstreaming of online education. *We believe this represents a new reality in the marketplace and requires us and others to adjust to it*. We also believe that this new reality is one that 2U is uniquely positioned to benefit from due to our size and comprehensive product set. So we're adjusting our executional model against the dynamic of this mainstreaming of online education in a way that meets this new market dynamic.

Competition for students has increased. Programs will be slightly smaller than they were in the past, but the scale benefits of 2U's overall operating model, a combination of 2UOS and products across the career curriculum continuum become even more important as more schools come online.

72.     On this news, the price of 2U stock declined 65% in a single trading day, on extremely high volume of over 54 million shares traded, to close at $12.80 per share on July 31, 2019. Given that 2U was trading at $98 per share at the peak of the Relevant Period, $12.80 per share represents a decline of over 86%.

**THE DIRECTOR DEFENDANTS ISSUED MATERIALLY FALSE AND MISLEADING PROXY STATEMENTS DURING THE RELEVANT PERIOD**

73.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period. The Director Defendants drafted, approved, reviewed, and/or signed two Form DEF14A before they were filed with the SEC and disseminated to 2U's stockholders on April 30, 2018 (the "2018 Proxy") and on April 30, 2019 (the "2019 Proxy"). The Director Defendants negligently issued materially misleading statements in the 2018 Proxy and 2019 Proxy. These proxy allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on

behalf of the Director Defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

74.     The 2018 Proxy sought stockholder votes to, among other things, elect defendants Maeder, Stavis, Paucek, and Peters for a three-year term.

75.     In support of the Director Defendants' bid to reelect defendants Maeder, Stavis, Paucek, and Peters, the Director Defendants highlighted their supposed oversight of the Company. In particular, the 2018 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that 2U faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2018 Proxy stated:

**Risk Oversight**

The Board oversees a company-wide approach to risk management that is carried out by management.  The Board determines the appropriate risk for us generally, assesses the specific risks faced by us and reviews the steps taken by management to manage those risks.   While the Board maintains the ultimate oversight responsibility for the risk management process, its committees oversee risk in certain specified areas.

\*          \*          \*

**Audit Committee**

Our Audit Committee consists of three directors, Messrs. Stavis, Lewis and Peters. Mr. Peters joined the Audit Committee and Mr. Chernis resigned from the Audit Committee on April 24, 2018. Mr. Stavis is the Chair of the Audit Committee, and our Board has determined that he is an ""audit committee financial expert"," as defined by SEC rules and regulations. Our Board has determined that the composition of our Audit Committee meets the criteria for independence under, and the functioning of our Audit Committee complies with, the applicable requirements of the Sarbanes-Oxley Act of 2002, the Nasdaq listing standards and SEC rules and regulations.  The Board has determined that all members of the Audit Committee are financially literate and possess "financial sophistication" within the meaning of the Nasdaq listing standards.  We intend to continue to evaluate the requirements applicable to us, and we intend to comply with the future requirements to the extent that they become applicable to our Audit Committee.

Our Audit Committee oversees the Company's corporate accounting and financial reporting processes. The principal duties and responsibilities of our Audit Committee include:

- appointing and retaining an independent registered public accounting firm to serve as independent auditor to audit our consolidated financial statements, overseeing and evaluating the independent auditor's work and determining the independent auditor's compensation;

- approving in advance all audit services and non-audit services to be provided to us by our independent auditor

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls, auditing or compliance matters, as well as for the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;

- reviewing and discussing with management and our independent auditor the results of the annual audit and the independent auditor's review of our quarterly consolidated financial statements; and

- conferring with management and our independent auditor about the scope, adequacy and effectiveness of our internal accounting controls, the objectivity of our financial reporting and our accounting policies and practices.

The Audit Committee's charter can be obtained without charge on the Company's website at http://investor.2u.com/.  As provided under the Audit Committee's charter, the Audit Committee's pre-approval policy and applicable law, the Audit Committee pre-approves all audit, review and attest services, as well as all permitted non-audit services (subject to a *de minimis* exception) to be provided by our independent registered public accounting firm.  This pre-approval applies to audit services, audit-related services, tax services and other services.  Under this policy, the Audit Committee may provide pre-approval for a particular defined task or scope of work, subject to a specific budget and for up to one year.  The Audit Committee may also delegate pre-approval authority to one or more of the Audit Committee's members, and the Audit Committee has delegated to the Chair of the Audit Committee the authority to pre-approve services (other than the annual engagement) up to a maximum of $50,000 per calendar year.  The Chair of the Audit Committee reports any pre-approval decisions at the next scheduled meeting of the Audit Committee.  To avoid potential conflicts of interest, applicable securities laws prohibit the Company as a publicly traded company from obtaining certain non-audit services from its independent audit firm.  We obtain these services from other service providers as needed.

*       *       *

**Corporate Governance**

We are committed to conducting our business in a way that reflects best practices, as well as the highest standards of legal and ethical conduct.  We want to be a company of integrity and to be perceived as such by everyone who comes in contact with us.  To that end, the Board has approved a comprehensive system of corporate governance documents.  These documents meet or exceed the requirements established by the Nasdaq listing standards and by SEC rules and are reviewed periodically and updated as necessary to reflect changes in regulatory requirements and evolving oversight practices.  These policies embody the principles, policies, processes and practices followed by the Board, executive officers and employees in governing the Company, and serve as a flexible framework for sound corporate governance.

*        *        *

**AUDIT COMMITTEE REPORT**

The Board has ultimate authority and responsibility for effective corporate governance, including the role of oversight of the management of 2U.  The Audit Committee's purpose is to assist the Board in fulfilling its responsibilities to the Company and its stockholders by overseeing the accounting and financial reporting processes of 2U, the audits of 2U's consolidated financial statements and the qualifications, selection and performance of the Company's independent registered public accounting firm.

The Audit Committee reviews our financial reporting process on behalf of the Board.  The Audit Committee relies on the expertise and knowledge of management and the independent auditor in carrying out its oversight responsibilities.  Management has the primary responsibility for establishing and maintaining effective systems of internal and disclosure controls, for preparing financial statements, and for the public reporting process.  KPMG LLP, 2's independent registered public accounting firm, is responsible for expressing opinions on the conformity of the Company's audited financial statements with generally accepted accounting principles and on our internal control over financial reporting.

With respect to the fiscal year ended December 31, 2017, the Audit Committee, among other things: oversaw the integrity of the Company's financial statements and financial reporting processes, oversaw compliance with legal and regulatory requirements, reviewed the external auditors' qualifications and independence (including auditor rotation), and evaluated the external auditors' performance.

The Audit Committee has reviewed and discussed with management and KPMG LLP the audited consolidated financial statements for the year ended December 31, 2017.  The Audit Committee also discussed with KPMG LLP all matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board.  In addition, the Audit Committee has

received from KPMG LLP the written disclosures and letter required by the applicable requirements of the Public Company Accounting Oversight Board regarding KPMG LLP's communications with the Audit Committee concerning independence, and the Audit Committee has had discussions with KPMG LLP regarding its independence from the Company and its management.

Based on the reviews and discussions described above, the Audit Committee recommended to our Board, and the Board approved, inclusion of the audited consolidated financial statements for the fiscal year ended December 31, 2017 in our Annual Report on Form 10-K for the year ended December 31, 2017 for filing with the SEC.  The Audit Committee and the Board have selected KPMG LLP as the Company's independent registered public accounting firm for fiscal year 2018.

76.     The 2018 Proxy, thus, assured stockholders that both the Individual Defendants and the Board members were involved with 2U's business strategy, actively monitored the Company's risks and exposures, were following good corporate governance practices and acting in an ethical and legal manner.  In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that:  (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory; (ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the Individual Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

77.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Maeder, Stavis, Paucek, and Peters.

78.     The 2019 Proxy sought stockholder votes to, among other things, elect defendants Haley, Jarrett, Lewis, and Rushing for a three-year term.

79.     In support of the Director Defendants' bid to reelect defendants Haley, Jarrett, Lewis, and Rushing, the Director Defendants highlighted their supposed oversight of the Company.  In particular, the 2019 Proxy assured stockholders that the Board and its committees regularly assess and manage the risks that 2U faces, including legal and regulatory risks, financial controls, and risks associated with compensation programs and plans.  The 2019 Proxy stated:

**Risk Oversight**

The Board oversees a company-wide approach to risk management that is carried out by management.  The Board determines the appropriate risk for us generally, assesses the specific risks faced by us and reviews the steps taken by management to manage those risks.  While the Board maintains the ultimate oversight responsibility for the risk management process, its committees oversee risk in certain specified areas.

\*      \*      \*

**Audit Committee**

Our Audit Committee consists of three directors, Messrs. Stavis, Lewis and Peters. Mr. Peters joined the Audit Committee and Mr. Chernis resigned from the Audit Committee on April 24, 2018. Mr. Stavis is the Chair of the Audit Committee, and our Board has determined that he is an "audit committee financial expert," as defined by SEC rules and regulations.  Our Board has determined that the composition of our Audit Committee meets the criteria for independence under, and the functioning of our Audit Committee complies with, the applicable requirements of the Sarbanes-Oxley Act of 2002, the Nasdaq listing standards and SEC rules and regulations.  The Board has determined that all members of the Audit Committee are financially literate and possess "financial sophistication" within the meaning of the Nasdaq listing standards. We intend to continue to evaluate the requirements applicable to us, and we intend to comply with the future requirements to the extent that they become applicable to our Audit Committee.

Our Audit Committee oversees the Company's corporate accounting and financial reporting processes.   The principal duties and responsibilities of our Audit Committee include:

- appointing and retaining an independent registered public accounting firm to serve as independent auditor to audit our consolidated financial

statements, overseeing and evaluating the independent auditor's work and determining the independent auditor's compensation;

- approving in advance all audit services and non-audit services to be provided to us by our independent auditor

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls, auditing or compliance matters, as well as for the confidential, anonymous submission by our employees of concerns regarding questionable accounting or auditing matters;

- reviewing and discussing with management and our independent auditor the results of the annual audit and the independent auditor's review of our quarterly consolidated financial statements; and

- conferring with management and our independent auditor about the scope, adequacy and effectiveness of our internal accounting controls, the objectivity of our financial reporting and our accounting policies and practices.

The Audit Committee's charter can be obtained without charge on the Company's website at http://investor.2u.com/.  As provided under the Audit Committee's charter, the Audit Committee's pre-approval policy and applicable law, the Audit Committee pre-approves all audit, review and attest services, as well as all permitted non-audit services (subject to a *de minimis* exception) to be provided by our independent registered public accounting firm.  This pre-approval applies to audit services, audit-related services, tax services and other services. Under this policy, the Audit Committee may provide pre-approval for a particular defined task or scope of work, subject to a specific budget and for up to one year. The Audit Committee may also delegate pre-approval authority to one or more of the Audit Committee's members, and the Audit Committee has delegated to the Chair of the Audit Committee the authority to pre-approve services (other than the annual engagement) up to a maximum of $50,000 per calendar year.  The Chair of the Audit Committee reports any pre-approval decisions at the next scheduled meeting of the Audit Committee.  To avoid potential conflicts of interest, applicable securities laws prohibit the Company as a publicly traded company from obtaining certain non-audit services from its independent audit firm. We obtain these services from other service providers as needed.

*       *       *

## Corporate Governance

We are committed to conducting our business in a way that reflects best practices, as well as the highest standards of legal and ethical conduct.  We want to be a company of integrity and to be perceived as such by everyone who comes in contact

with us.  To that end, the Board has approved a comprehensive system of corporate governance documents.  These documents meet or exceed the requirements established by the Nasdaq listing standards and by SEC rules and are reviewed periodically and updated as necessary to reflect changes in regulatory requirements and evolving oversight practices.  These policies embody the principles, policies, processes and practices followed by the Board, executive officers and employees in governing the Company, and serve as a flexible framework for sound corporate governance.

*       *       *

**AUDIT COMMITTEE REPORT**

The Board has ultimate authority and responsibility for effective corporate governance, including the role of oversight of the management of 2U.  The Audit Committee's purpose is to assist the Board in fulfilling its responsibilities to the Company and its stockholders by overseeing the accounting and financial reporting processes of 2U, the audits of 2U's consolidated financial statements and the qualifications, selection and performance of the Company's independent registered public accounting firm.

The Audit Committee reviews our financial reporting process on behalf of the Board.  The Audit Committee relies on the expertise and knowledge of management and the independent auditor in carrying out its oversight responsibilities. Management has the primary responsibility for establishing and maintaining effective systems of internal and disclosure controls, for preparing financial statements, and for the public reporting process.  KPMG LLP, 2U's independent registered public accounting firm, is responsible for expressing opinions on the conformity of the Company's audited financial statements with generally accepted accounting principles and on our internal control over financial reporting.

With respect to the fiscal year ended December 31, 2018, the Audit Committee, among other things: oversaw the integrity of the Company's financial statements and financial reporting processes, oversaw compliance with legal and regulatory requirements, reviewed the external auditors' qualifications and independence (including auditor rotation), and evaluated the external auditors' performance.

The Audit Committee has reviewed and discussed with management and KPMG LLP the audited consolidated financial statements for the year ended December 31, 2018.  The Audit Committee also discussed with KPMG LLP all matters required to be discussed by the applicable requirements of the Public Company Accounting Oversight Board.  In addition, the Audit Committee has received from KPMG LLP the written disclosures and letter required by the applicable requirements of the Public Company Accounting Oversight Board regarding KPMG LLP's communications with the Audit Committee concerning independence, and the Audit Committee has had discussions with KPMG LLP regarding its independence from the Company and its management.

Based on the reviews and discussions described above, the Audit Committee recommended to our Board, and the Board approved, inclusion of the audited consolidated financial statements for the fiscal year ended December 31, 2018 in our Annual Report on Form 10-K for the year ended December 31, 2018 for filing with the SEC.  The Audit Committee and the Board have selected KPMG LLP as the Company's independent registered public accounting firm for fiscal year 2019.

80.     The 2019 Proxy, thus, assured stockholders that both the Individual Defendants and the Board was involved with 2U's business strategy, actively monitored the Company's risks and exposures, was following good corporate governance practices and acting in an ethical and legal manner.  In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose to investors that:  (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory; (ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the Individual Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

81.     As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect defendants Haley, Jarrett, Lewis, and Rushing.

**THE INSIDER SELLING DEFENDANTS SOLD SUBSTANTIAL SHARES OF 2U STOCK WHILE IN POSSESSION OF MATERIAL, ADVERSE, INFORMATION REGARDING THE COMPANY'S BUSINESS**

82.     During the Relevant Period, certain of the Individual Defendants—specifically, the Insider Selling Defendants—engaged in numerous sales of 2U common stock while in possession of material information that was averse to 2U's business.

83.     In particular, during the Relevant Period, the Insider Selling Defendants sold a total of almost 324,000 shares of 2U common stock for proceeds of over $27.3 million.

84.     In making the insider trades, the Insider Selling Defendants were able to unjustly profit from artificially high trading levels stemming from the Individual Defendants' concerted false and misleading statements disseminated to the market.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.     During all times relevant hereto, the Individual Defendants, collectively and individually, failed to disclose to investors that: (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory; (ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the Individual Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

87.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

88.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment; and to conceal adverse information concerning the Company's business practices and the quality of its products.

89.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

90.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### DAMAGES TO THE COMPANY

91.   As a result of the Individual Defendants' wrongful conduct, 2U disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated 2U's credibility.  2U has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

92.     Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Actions.

93.     As a direct and proximate result of the Individual Defendants' actions as alleged above, 2U's market capitalization has been substantially damaged, losing approximately $3 billion in value as a result of the conduct described herein.

94.     Moreover, these actions have irreparably damaged 2U's corporate image and goodwill.  For at least the foreseeable future, 2U will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that 2U's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff incorporates the allegations herein by reference.

96.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

97.     Plaintiff is a stockholder of 2U, was a stockholder of 2U at the time of the wrongdoing alleged herein, and has been a stockholder of 2U continuously since that time.

98.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting 2U's rights.

99.     At the time of the filing of this complaint, the 2U Board consisted of the twelve Director Defendants:  Paucek, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing, Krawcheck, Larson, Macias, and Maybank.

100.     As a result of the facts set forth herein, Plaintiff has not made any demand on the 2U Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the current members of the Board because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

## DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

101.     The Individual Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

102.     Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or recklessly allowed, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Individual Defendants face a substantial

likelihood of liability.  If the Director Defendants were to bring a suit on behalf of 2U to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Individual Defendants.

103.    Further, defendant Paucek is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Actions.  Additionally, defendant Paucek is not independent because his principal source of income comes from his employment with 2U.  Indeed, the Company's filings with the SEC, including the 2019 Proxy, concede that defendant Paucek is not independent. In 2018 alone, defendant Paucek received $16,923,643 from the Company in compensation.  This amount is material to him.

**DEMAND IS EXCUSED AS TO THE AUDIT COMMITTEE DEFENDANTS BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

104.    As members of the Audit Committee during the Relevant Period, the Audit Committee Defendants participated in and knowingly approved filing of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.   More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements. Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

## COUNT I
### VIOLATION OF SECTION 14(A) OF THE EXCHANGE ACT
### (Against the Director Defendants)

105.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.   The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The Section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

107.   The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the 2018 Proxy and the 2019 Proxy.  In the 2018 Proxy and the 2019 Proxy, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

108.   The 2018 Proxy and the 2019 Proxy, however, misrepresented and failed to disclose, among other things, the Board's risk oversight and the Company's inadequate internal controls which facilitated the illegal behavior described herein.  By reasons of the conduct alleged herein, the Director Defendants violated Section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, 2U misled and deceived its stockholders by making materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants to the Board.

109.   Plaintiff, on behalf of 2U, thereby seeks relief for damages inflicted upon the Company based upon the misleading 2018 Proxy and 2019 Proxy in connection with the improper reelection of the Director Defendants to the Board.

## COUNT II
### BREACH OF FIDUCIARY DUTY
### (Against the Individual Defendants)

110.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

111.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 2U's business and affairs.

112.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

113.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.   The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of 2U.

114.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

115.    In addition, the Individual Defendants further breached their fiduciary duties owed to 2U by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and failed to disclose to investors that (i) 2U's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's cash flows were inadequate for maintaining its purported growth trajectory; (ii) the Company would not be able to take advantage of promised economies of scale, as the cost of creating content and attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity; (iii) the growth rate in revenue from enrollments was decelerating and had plateaued; and (iv) as a result of the foregoing, 2U was experiencing accelerating losses, its business plan was unsustainable, and the Individual

Defendants lacked any reasonable basis for 2U's projections and financial forecasts during the Relevant Period.

116. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

117. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

118. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

119. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

120. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, 2U has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

121. Plaintiff, on behalf of 2U, has no adequate remedy at law.

## COUNT III
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
### (Against the Insider Selling Defendants)

122.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

123.    At the time each of the Insider Selling Defendants sold his or her 2U stock, he or she knew the material, non-public information described above, and sold 2U stock on the basis of such information.

124.    The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in 2U stock.  Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of 2U stock.

125.    The Insider Selling Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to 2U for insider trading.

126.    Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

127.    Plaintiff, on behalf of 2U, has no adequate remedy at law.

**COUNT IV**
**UNJUST ENRICHMENT**
**(Against the Individual Defendants)**

128.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as if fully set forth herein.

129.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expenses s of and to the detriment of 2U.  The Individual Defendants were unjustly enriched by their receipt of compensation while breaching fiduciary duties owed to 2U.

130.     Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

131.     Plaintiff, on behalf of 2U, has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of 2U and that Plaintiff is a proper and adequate representative of the Company;

B.     Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.     Determining and awarding to 2U restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by them;

D.      Directing 2U to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a recurrence of the damaging events described herein;

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: April 30, 2020                         Respectfully Submitted,

                                              **BRAGAR EAGEL & SQUIRE, P.C.**

                                              */s/ Melissa A. Fortunato*
                                              Melissa A. Fortunato
                                              Garam Choe
                                              885 Third Avenue, Suite 3040
                                              New York, New York 10022
                                              Telephone: (212) 355-4648

                                              *Attorneys for Plaintiff*